UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**TERRY BURDETTE TUTEN,**

    **Plaintiff,**

v.                                         Case No: 8:18-cv-1391-T-36TGW

**N. ZALVA,**

    **Defendant.**
_____/

**ORDER**

This cause is before the Court on the parties' cross-motions for summary judgment. Plaintiff Terry Burdette Tuten moved for summary judgment (Doc. 53), to which Defendant Neal Zalva responded in opposition (Docs. 60–61). Defendant Zalva moved for summary judgment (Docs. 62–66, 73), to which Plaintiff responded in opposition (Doc. 70). For the reasons that follow, Plaintiff's motion (Doc. 53) will be denied and Defendant's motion (Doc. 62) will be granted.

**I.**     **Background**

Although Plaintiff's Amended Complaint does not set forth his claims in separate counts, the Court discerns five alleged constitutional violations asserted by Plaintiff. Specifically, Plaintiff alleges that between April 20 and 21, 2018, Defendant Zalva, a Pasco County Sheriff's Officer, wrongfully detained and arrested him, used excessive force against him, was deliberately indifferent to his medical needs, and unlawfully seized his personal property in violation of his Fourth, Eighth, and Fourteenth Amendment rights under the United States Constitution.[1]

---

[1] The Amended Complaint also cites the Privileges and Immunities clause, the First Amendment, and the Eighth Amendment. (Doc. 18 at 9). However, the Amended Complaint contains no factual allegations related to those

## II. <u>Standard of Review</u>

The granting of summary judgment is proper "if pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it may affect the outcome of the suit under governing law. *Id.* at 248.

The Court must consider the evidence in the light most favorable to the non-moving party and the evidence must show that the non-moving party is not entitled to relief under any set of facts alleged in the complaint. *See generally*, *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003), *Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590 (11th Cir. 1995).

The party moving for summary judgment bears the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). The moving party discharges that burden by showing that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once the movant presents evidence that, if not controverted, would entitle the movant to a judgment at trial, the burden shifts to the non-moving party to assert specific facts demonstrating the existence of a genuine issue of fact for trial. *Anderson*, 477 U.S. at 250 (1986); *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir. 2001).

---

provisions. Further, during deposition, Plaintiff described the categories of his claims as false arrest and imprisonment, excessive force, and theft. (Doc. 66 at 60–61).

Allegations in a *pro se* complaint are held to a less stringent standard than a formal pleading drafted by a lawyer. *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam); *Tannenbaum v. United States*, 148 F.3d 1262 (11th Cir. 1998). However, the plaintiff's allegations must have factual support. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1321 (11th Cir.) *reh'g and suggestion for reh'g en banc denied*, 182 F.3d 938 (11th Cir.), *cert. dismissed*, 528 U.S. 948 (1999). *See also Cuesta v. School Bd. of Miami-Dade Cty.*, 285 F.3d 962, 970 (11th Cir. 2002) ("A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.' ").

"[C]ross-motions may be probative of the non-existence of a factual dispute," but "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)).

### III. Undisputed Facts[2]

In the early morning hours of April 21, 2018, approximately 2:56 a.m., Defendant Neal Zalva, a Deputy with the Pasco County Sheriff's Office, was patrolling State Road 54 in New Port Richey, Florida, in his marked Pasco County Sheriff's patrol vehicle. (Doc. 19 at 4; Doc. 61 at 1). He observed an individual, later determined to be Plaintiff, driving a motorized scooter at or near

---

[2] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including depositions, affidavits and exhibits attached thereto, and video from body cameras.

the side of Trinity Towers Self Storage Facility on State Road 54. The scooter was turning onto a dirt road behind and against the storage facility. (Doc. 26 at 1; Doc. 61 at 1; Doc. 66 at 27).[3]

In Defendant's experience, "there had been several recent burglaries at storage facilities in [W]est Pasco." (Doc. 61 at 2). When Defendant observed the scooter driving in the area "behind and against th[e] storage facility at such an early hour . . . and then turn to leave upon [his] patrol car approaching the area, [he] suspected that the person on the scooter was there to burglarize, or had burglarized, a unit at the storage facility." (Doc. 61 at 2).

As he approached the storage facility, Defendant observed Plaintiff change direction and drive toward State Road 54. (Doc. 61 at 1; Doc. 66 at 27–28). Defendant stopped the patrol car so that he was facing Plaintiff and activated the lights on the patrol car. (Doc. 18 at 9; Doc. 26 at 2; Doc. 61 at 2). Defendant then stepped out of the patrol car, with the lights still on, and ordered Plaintiff to stop. (Doc. 61 at 2; Doc. 66 at 28–29). Plaintiff heard the order to stop, but he did not stop; he continued to drive the scooter slowly toward Defendant. (Doc. 66 at 28–30).

Defendant called over the police radio for backup. (Doc. 61 at 2). As Plaintiff was passing by him on the scooter, Defendant grabbed Plaintiff by either the neck, the shirt he was wearing, or the backpack he was carrying.[4] (Doc. 18 at 10; Doc. 61 at 2; Doc. 66 at 31–32, 34–35). When the scooter came to a stop next to the patrol car, Defendant asked Plaintiff to engage the kickstand, to which Plaintiff appeared to comply, as the motor was running, but the scooter remained stationary. Plaintiff then dismounted the scooter by himself, removed his backpack when asked to do so by

---

[3] Plaintiff describes the area he was in as a parking lot but indicates that he was on a "turn-in" to the parking lot and had been driving the scooter by the side of the storage facility. (Doc. 18 at 9; Doc. 66 at 71–72). Defendant describes the area as a dirt road behind and against the storage facility. (Doc. 61 at 1).

[4] Although Plaintiff alleged in the Amended Complaint that Defendant grabbed him by the neck (Doc. 18 at 9–10), he stated at deposition Defendant could have grabbed his shirt. (Doc. 66 at 31–32).

4

Defendant, and raised his hands over his head. (Video of footage from body camera worn by Deputy Neal Zalva ("Zalva video"), Doc. 64-1 at 0:00:01-18).[5]

Once Plaintiff got off the scooter, Defendant asked Plaintiff to put his hands behind his head, patted him down, handcuffed him, and advised him that he was being detained. (Doc. 61 at 2; Zalva video, Doc. 64-1 at 0:00:018–0:01:26; Doc. 66 at 33, 38). When asked to identify himself, Plaintiff gave a fictitious name and, later, a fictitious birthdate. (Doc. 61 at 2–3; Zalva video, Doc. 64-1 at 0:01:02–07, 0:03:09–21; Doc. 66 at 36–37). Additional officers, responding to Defendant's request for backup, arrived at the scene shortly thereafter. (Doc. 61 at 2; Zalva video, Doc. 64-1 at 0:02:44).

When asked what he was doing there, Plaintiff responded that the scooter's throttle was stuck, and he was trying to get it to work; he could not get it to turn off. (Doc. 61 at 3; Zalva video, Doc. 64-1 at 0:03:020–0:03:40). A back-up officer was able to turn it off. (Doc. 61 at 3; Zalva video, Doc. 64-1 at 0:03:035–0:03:40; Doc. 66 at 31). The officers then noticed that the license plate on the scooter was not a real license plate. (Doc. 61 at 3; Zalva video, Doc. 64-1 at 0:03:055–

---

[5] In his Amended Complaint, Plaintiff states that Defendant "yanked [him] off the scooter." (Doc. 18 at 10). At deposition, Plaintiff testified that Defendant "yanked [him] off the scooter and threw [him] on the back of [his] neck, between [his] head and shoulder area on [his] back." (Doc. 66 at 30). He further testified that the scooter "shot off into the ditch" and that another officer "pulled the sparkplug or something. The[] [officer] stopped it and stuck it up on the kickstand." (Doc. 66 at 30–31). Then, in his Response to Defendant's Motion for Summary Judgment, Plaintiff claims the video from Defendant's body camera shows that "[Defendant] and [Plaintiff] upright[ed] the crashed motor scooter" (Doc. 70 at 1), rather than another officer. He concludes without foundation or explanation that the fact that the camera did not start recording until that point shows the video had been tampered with. (*Id.*)

However, the video from Defendant's body camera, which appears to begin at the time Plaintiff came to a stop on the scooter next to Defendant's patrol car, shows Plaintiff as he appears to engage the kickstand and then get off the scooter by himself. Plaintiff did not fall or otherwise end up on the ground, and the scooter did not shoot off into a ditch. (Zalva video, Doc. 61-1 at 0:00:01-18). The Court adopts the uncontroverted video evidence as true for the purpose of ruling on the motions for summary judgment in this case. *See Mathis v. Adams*, 577 F. App'x 966, 968 (11th Cir. 2014) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (explaining that, although facts are generally viewed in the light most favorable to the non-moving party at the summary judgment stage, " '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.' More specifically, when uncontroverted video evidence is available, the court should view the facts in the light depicted by the video recording.").

0:04:20). Plaintiff stated that the scooter was his and that the plate had been stolen. (Zalva video, Doc. 64-1 at 0:04:15–30, 0:04:32–37). Subsequently, Plaintiff stated that the scooter belonged to Jared Selnick, who was selling it to Plaintiff's roommate. (Doc. 61 at 3; Zalva video, Doc. 64-1 at 0:06:50–0:07:00). Neither the fake license plate nor the scooter's VIN number showed the scooter belonged to Jared Selnick. (Doc. 61 at 3; Doc. 63-1 at 9, 11). Plaintiff later said his roommate was buying the scooter, but would not give his roommate's name, and he stated he didn't know who the roommate was buying the scooter from. (Zalva video, Doc. 64-1 at 0:12:05–15).

Investigation into the name given by Plaintiff, throughout the course of the investigatory stop, yielded no matching results. (Doc. 61 at 2–3; Doc. 66 at 37–38). Plaintiff was unable to give his address or a complete social security number and stated he'd just gotten out of jail in Alabama. (Doc. 61 at 3; Zalva video, Doc. 64-1 at 0:06:20–55, 13:20–38). Plaintiff continued to give a fictitious name to Defendant and the backup officers for more than thirty minutes. (Doc. 61 at 3; Doc. 66 at 38).

Defendant then removed Plaintiff's gloves to identify him via fingerprints, during which Plaintiff resisted and complained as if in pain, saying his hand was cramped. (Doc. 61 at 3–4; Video of footage from body camera worn by Deputy Spencer Holcomb ("Holcomb video"), Doc. 64-10 at 0:01:10–7:40). A bag containing what appeared to be drugs fell out of one of the gloves as it was removed. (Doc. 61 at 4; Holcomb video, Doc. 64-10 at 0:06:48). Plaintiff admitted that the bag contained marijuana, and a field test confirmed the substance was marijuana. (Zalva video, Doc. 64-2 at 0:01:50–0:04:45; Holcomb video, Doc. 64-10 at 0:06:58–0:07:00, 0:11:00–0:13:25). Plaintiff was placed under arrest and read his *Miranda* rights. (Doc. 61 at 4; Zalva video, Doc. 64-2 at 0:00:28–0:01:50; Holcomb video, Doc. 64-10 at 0:10:00–0:11:05). The fingerprints did not yield any matching results. (Doc. 61 at 4).

6

Next, Defendant removed Plaintiff from the patrol car and looked for tattoos to use to identify him. Among other tattoos, they found "TUTEN" spelled out on Plaintiff's right arm; Plaintiff denied that it was his last name. (Zalva video, Doc. 64-2 at 0:00:00–0:03:40). Even after the officers discovered Plaintiff's identity by researching his tattoos in the computer system, Plaintiff initially denied his name was Terry Tuten when confronted by Defendant. Plaintiff finally admitted to his name shortly thereafter. (Doc. 61 at 4; Zalva video, Doc. 64-5 at 0:00:05–1:05; Doc. 64-6 at 0:00:27–33).

Plaintiff did not request medical assistance or treatment from Defendant.[6] (Doc. 61 at 4; Zalva video, Docs. 64-6, 64-7, 64-8). Once held at the jail, following his request there for medical care, Plaintiff was evaluated by a nurse and provided no treatment other than being told where he could purchase Ibuprofen. (Doc. 66 at 49–51). His alleged symptoms resolved on their own over time and he regained normal function within a few months. (Doc. 66 at 51).

No cash or currency was noted on the arrest affidavit or provided to the jail to be held for Plaintiff. (Doc. 18 at 10; Doc. 61 at 5; Doc. 63-2 at 1–2; Doc. 66 at 44).

Plaintiff was charged with possession of a counterfeit license tag, possession of twenty grams or less of marijuana, resisting or obstructing an officer without violence, loitering and prowling, and giving a false name to a law enforcement officer. (Doc. 61 at 4; Doc. 63-1 at 1–2). All of the charges were later dismissed. (Doc. 19 at 2–3; Doc. 66 at 43).

---

[6] In the Amended Complaint, Plaintiff states, "I said to officers I need medical treatment[,] also medical staff was denied." (Doc. 18 at 11). At deposition, Plaintiff testified that, once Defendant and the other officers had figured out his identity, "[he] told Officer Zalva [he] wanted to be medically cleared by a hospital before [he] came to jail, and [Defendant] refused me." (Doc. 66 at 48). However, review of Defendant's body camera from the time of Plaintiff's identification until the time they reached the jail reveals no such request. (Zalva video, Docs. 64-6, 64-7, 64-8).

## IV. Analysis

To succeed on his Section 1983 claims, Plaintiff must demonstrate "the violation of a right secured by the Constitution and laws of the United States" by "a person acting under color of state law." *Cummings v. DeKalb Cty.*, 24 F.3d 1349, 1355 (11th Cir. 1994). Regarding section 1983 claims, "[q]ualified immunity offers complete protection for government officials sued in their individual capacities when acting within their discretionary authority if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1305 (11th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To establish qualified immunity, the government official must first show that he was engaged in a discretionary function when he committed the allegedly unlawful acts. *See Corey Airport Servs., Inc. v. Decosta*, 587 F.3d 1280, 1285 (11th Cir. 2009). If the official was not acting within the scope of his discretionary authority, then he is ineligible for the benefit of qualified immunity.[7] *Id.* If, however, the defendant met the initial burden of establishing that he was acting within the scope of his discretionary authority, then the burden shifts to the plaintiff to show that qualified immunity is inappropriate. *Id.*

Here, Plaintiff does not dispute that Defendant was acting within the scope of his discretionary authority as a Pasco County Sheriff's Officer. Accordingly, the burden shifts to Plaintiff to show that qualified immunity is inappropriate. In order to do so, Plaintiff must present factual evidence showing (1) Defendant violated a constitutional right, and (2) this right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003). "Clearly established" means that it would

---

[7] To establish that the challenged actions were within the scope of discretionary authority, the Defendant must show that those actions were: "(1) undertaken pursuant to the performance of [their] duties, and (2) within the scope of [their] authority." *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006).

8

be clear to a reasonable official that his conduct was unlawful in the situation he confronted. *Saucier*, 533 U.S. at 201–02.

### A. Investigatory Stop

Plaintiff claims that he was improperly detained in violation of his constitutional rights. (Doc. 18 at 9–10; Doc. 53 at 2). In his Amended Complaint, he vaguely alleges "there is no such thing" as an investigatory stop and that Defendant's stop was improper. (Doc. 18 at 10). In his motion for summary judgment, he clarifies that he alleges he was unlawfully seized without a warrant. (Doc. 53 at 2).

An officer may conduct an investigatory stop, also known as a *Terry* stop, if the officer "ha[s] a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity. The 'reasonable suspicion' must be more than an 'inchoate and unparticularized suspicion or hunch.' " *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

Here, according to the undisputed facts, Defendant spotted Plaintiff riding a motorized scooter next to or behind a storage facility at 2:56 a.m. Defendant was aware that burglaries had occurred recently at storage facilities in the area. As Defendant approached in his marked patrol car, Plaintiff made a u-turn and proceeded toward the exit of the storage facility. Based on his experience, the recent burglaries at storage facilities and Plaintiff's actions as the patrol car approached, Defendant suspected that the person on the scooter was there to burglarize or had burglarized a unit at the storage facility. Plaintiff also continued to drive the scooter—albeit slowly—past Defendant once ordered to stop. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)

(citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975); *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984) (per curiam); *United States v. Sokolow*, 490 U.S. 1, 8–9, 109 (1989)) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."). Here, based on the totality of the circumstances, the stop was reasonable at its inception.

The Court must also determine "whether the investigative detention . . . was sufficiently limited in scope and duration to remain within the bounds permitted by *Terry v. Ohio* and not ripen into a full-scale arrest unsupported by probable cause." *United States v. Hardy*, 855 F.2d 753, 758 (11th Cir. 1988). Accordingly, the Court considers "the law enforcement purposes served by the detention, the diligence with which the police pursue[d] the investigation, the scope and intrusiveness of the detention, and the duration of the detention." *Id.* at 759.

The Court concludes that Plaintiff's detention — which did not end until Plaintiff was formally placed under arrest and read his *Miranda* rights following the officers' discovery of marijuana in his glove — did not exceed the bounds of a *Terry* stop. First, the detention served the law enforcement purpose of allowing Defendant to investigate what appeared to be an individual burglarizing a storage facility. Second, Defendant diligently pursued the investigation by attempting to ascertain Plaintiff's identity, which Plaintiff concedes he lied about for more than thirty minutes. Thus, the duration of the stop, under forty minutes, before Plaintiff was arrested is not unreasonable. Once detained, the possibility of additional offenses — a fake license plate and possession of marijuana — arose, which justified a longer detention as further investigation into those offenses became necessary. Third, although he was handcuffed for officer safety, Plaintiff was informed that he was being detained, but not arrested. *United States v. Kapperman*, 764 F.2d 786, 790 n.4 (11th Cir. 1985) ("[N]either handcuffing nor other restraints will *automatically* convert a *Terry* stop into a *de facto* arrest requiring probable cause.").

Ultimately, Plaintiff has not presented factual evidence showing Defendant violated a constitutional right. For purposes of the qualified immunity analysis, Defendant had, at a minimum, arguable reasonable suspicion, and at best, reasonable suspicion, to conduct an investigatory stop of Plaintiff. Therefore, Defendant is entitled to qualified immunity on this claim.

### B. Arrest & Imprisonment

Plaintiff also claims that he was "taken to jail for [five] charges that had no merit." (Doc. 18 at 10). He states that the charges "were all dropped due to lack of evidence and i[m]proper procedural stop." (Doc. 18 at 10).

"A warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim. An arrest made with probable cause, however, constitutes an absolute bar to a section 1983 action for false arrest." *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) (citations omitted). Probable cause to arrest exists when, considering the totality of the circumstances, "law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992) (citing *Illinois v. Gates*, 462 U.S. 213, 233 (1983); *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

"[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates*, 462 U.S. at 243 n.13. For purposes of section 1983, "[i]t is enough that probable cause exist[ed] to arrest for any crime." *Baysa v. Gualtieri*, 786 F. App'x 941, 944 (11th Cir. 2019) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)) (explaining that "while the Deputies arrested [the defendant] for disorderly conduct in an establishment and resisting arrest without violence, probable cause for an arrest for trespass would be enough to bar [the defendant's] § 1983 false arrest claim."). Even without actual probable

11

cause, "a police officer is entitled to qualified immunity if he had only 'arguable' probable cause to arrest the plaintiff." *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018).

The undisputed facts show that Plaintiff was placed under arrest after Defendant and the other officers saw marijuana, an illegal substance, fall from Plaintiff's glove. Plaintiff admitted, and the field test confirmed, that the substance was marijuana. This was enough to justify Defendant's warrantless arrest of Plaintiff, as a reasonable officer could believe the facts and circumstances indicated Plaintiff had committed a crime. In addition, the license plate on the scooter was not real, and, after his arrest, further probable cause developed when Plaintiff's identity was discovered and Plaintiff admitted he was Terry Tuten, rather than Troy Davis as he originally claimed.

Plaintiff has not presented factual evidence showing Defendant violated a constitutional right. For purposes of the qualified immunity analysis, Defendant had, at a minimum, arguable probable cause, and at best, probable cause, to arrest Plaintiff. Defendant is entitled to qualified immunity on this claim.

### C. Excessive Force

"An officer's use of force is excessive under the Fourth Amendment if the use of force was 'objectively unreasonable in light of the facts and circumstances confronting the officer.' " *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011) (quoting *Graham*, 490 U.S. at 397). The Court must judge reasonableness from the perspective of a "reasonable officer on the scene" without the benefit of hindsight and allowing for the fact that officers are often forced to make split-second judgments regarding the use of force in "tense, uncertain, and rapidly evolving circumstances." *Id.*

Under the Fourth Amendment, an officer may not use excessive force "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 396–97. The Court assesses "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. "[O]fficers may not use substantial force to apprehend a nonthreatening suspect who has committed only a minor offense and is not resisting arrest." *Johnson v. White*, 725 F. App'x 868, 876 (11th Cir. 2018).

In his amended complaint, Plaintiff claims that Defendant grabbed Plaintiff by "[his] neck and shirt and yanked [him] off the scooter for no reason." (Doc. 18 at 10). At deposition, Plaintiff testified that Defendant "yanked [him] off the scooter and threw [him] on the back of [his] neck, between [his] head and shoulder area on [his] back." (Doc. 66 at 30; *see also* Doc. 66 at 29, 31).[8] Plaintiff claims he suffered injuries to his neck, shoulders, right ankle, left foot, and right toes. (*Id.*).

However, the undisputed facts demonstrate that, notwithstanding Defendant's order to stop, Plaintiff attempted to drive the scooter past Defendant without stopping. Defendant grabbed Plaintiff, bringing him to a stop, but Plaintiff dismounted the scooter on his own and was not thrown to, or did not otherwise end up on, the ground. He also did not request medical treatment. Given that Defendant reasonably could have believed Plaintiff was attempting to evade arrest, Defendant used only enough force to bring Plaintiff and the scooter to a stop, and Plaintiff

---

[8] While Plaintiff was being fingerprinted, he complained as if he was in pain, saying his hand was cramped. (Doc. 61 at 3–4; "Holcomb video," Doc. 64-10 at 0:01:10–7:40). However, the Amended Complaint does not describe that interaction and Plaintiff stated at deposition that his excessive force claim was related to Defendant's actions in removing Plaintiff from the scooter. (Doc. 66 at 42).

13

remained on the scooter and was not pulled off of it or thrown to the ground, Plaintiff has not demonstrated Defendant's actions were objectively unreasonable in light of the circumstances confronting him at the time. Therefore, Plaintiff has not presented factual evidence showing Defendant violated a constitutional right, and Defendant is entitled to qualified immunity on this claim.

### D. Deliberate Indifference

Plaintiff alleges in the Amended Complaint that "[he] said to officers [he] need[ed] medical treatment[,] also medical staff was denied." (Doc. 18 at 11). At deposition, Plaintiff testified that, once Defendant and the other officers figured out his identity, "[he] told Officer Zalva [he] wanted to be medically cleared by a hospital before [he] came to jail, and [Defendant] refused me." (Doc. 66 at 48).

The Eleventh Circuit has explained that

> Deliberate indifference to a detainee's serious medical needs requires 1) an objectively serious medical need and 2) a defendant who acted with deliberate indifference to that need. A "serious medical need" is "one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment." For liability, the defendant must 1) have subjective knowledge of a risk of serious harm, 2) disregard that risk, and 3) display conduct beyond gross negligence.

*Poumoghani-Esfahani v. Gee*, 625 F.3d 1313, 1317 (11th Cir. 2010) (quoting *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008)).

Here, the undisputed facts show that Plaintiff did not request medical assistance from Defendant. *See supra*, n.5. When evaluated at the jail, he received no treatment, and he does not challenge the jail's lack of treatment. Plaintiff also conceded at deposition that the alleged symptoms resolved without treatment within a few months. Accordingly, the undisputed facts do not demonstrate that Plaintiff had an objectively serious medical need; nor do the facts show that

14

Defendant had subjective knowledge of a risk of serious harm or that Defendant disregarded that risk by conduct that was more than gross negligence. Therefore, Plaintiff has not presented factual evidence showing Defendant violated a constitutional right, and Defendant is entitled to qualified immunity on this claim.

**E. Unlawful Seizure or Retention of Property**

Finally, Plaintiff claims that, at the time of his arrest, he was carrying $3,500 in cash because he had just been paid. (Doc. 18 at 10). He claims that this money was taken from him during the arrest, that he was not given a receipt, and that the money was never returned to him. (*Id.*).

The Supreme Court has held that neither negligent deprivation of property nor "unauthorized intentional deprivation of property by a state employee . . . constitute a [constitutional] violation . . . if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). Plaintiff has an adequate post-deprivation remedy under state law — a suit for theft or conversion. *See Case v. Eslinger*, 555 F.3d 1317, 1331 (11th Cir. 2009). Therefore, this claim is not cognizable in a section 1983 action, and Plaintiff cannot demonstrate that Defendant violated a constitutional right. Defendant is entitled to qualified immunity on this claim.

Plaintiff has failed to present factual evidence showing that Defendant violated a constitutional right. Therefore, Defendant is entitled to qualified immunity on all of Plaintiff's claims and to summary judgement in his favor as a matter of law.

Accordingly, it is **ORDERED** and **ADJUDGED** that:

1. Plaintiff's motion for summary judgment (Doc. 53) is **DENIED**.

2. Defendant's motion for summary judgment (Doc. 62) is **GRANTED**.

3. The Clerk is directed to enter judgment in favor of Defendant Neal Zalva and **CLOSE** this case.

**DONE** and **ORDERED** in Tampa, Florida on February 11, 2020.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

Copies furnished to:
All parties of record including unrepresented parties, if any